In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1997

HEALTH CARE INDUSTRY LIABILITY
INSURANCE PROGRAM,

*Plaintiff-Appellee,*

*v.*

MOMENCE MEADOWS NURSING CENTER, INC., and
JACOB GRAFF,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07 C 02005—**David G. Bernthal**, *Magistrate Judge.*

ARGUED JANUARY 9, 2009—DECIDED MAY 20, 2009

Before MANION, ROVNER, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.*   Vanessa Absher and Lynda
Mitchell sued Momence Meadows Nursing Center, Inc.,
and its owner and operator, Jacob Graff (collectively
"Momence"). They sought damages for themselves and
on behalf of the United States and the State of Illinois
for alleged violations of the federal False Claims Act

("FCA"), 31 U.S.C. § 3729 et seq., and the Illinois Whistle-
blower Reward and Protection Act ("IWRPA"), 740 ILCS
175/1 et seq. The Health Care Industry Liability Insurance
Program ("Healthcap") filed this action seeking a declara-
tion that it had no duty to defend Momence in that law-
suit under a commercial general liability policy it had
issued to Momence. The district court found that
Healthcap had no duty to defend Momence, and
Momence appeals. We affirm.

## I.

Vanessa Absher and Lynda Mitchell are former em-
ployees at Momence's nursing center. In their third
amended complaint (which we will refer to hereafter as
the "underlying complaint"), Absher and Mitchell sought
treble damages for exposing thousands of false charges
Momence submitted to Medicare and Medicaid. Their
theory of recovery was predicated on the statutory re-
quirement that Medicare and Medicaid providers may
not submit claims for services that failed to meet "profes-
sionally recognized standards of health care." 42 U.S.C.
§ 1320c-5(a)(2). According to Absher and Miller, Momence
violated that requirement by certifying on its annual cost
reports that it was meeting the required standard of
care when, in fact, Momence's management knew that
it was not.

The underlying complaint provides detailed allegations
of how Momence was not meeting the standard of care
for Medicare and Medicaid. It alleges, for instance, that
Momence failed to maintain the minimum staffing levels

for nurse and nurse assistants, failed to ensure its residents received their medications as prescribed by their physicians, failed to ensure residents received adequate nutrition and assistance with meals, and failed to provide the residents with clean and dry beds, clothes, and regular baths. The underlying complaint devotes several pages to further elaborating these alleged standard-of-care failures. Included in those pages is a detailed description of the resulting injuries patients suffered from Momence's substandard care, such as scabies, sepsis, seizures, and death.

The underlying complaint sets forth four counts. In count one, the plaintiffs seek statutory and treble damages under the FCA for Momence's submission of false claims to the United States. In count two, they seek statutory and treble damages under the IWRPA for Momence's submission of false claims to the state of Illinois. In counts three and four, Absher and Mitchell seek damages under the anti-retaliation provisions of the FCA and IWRPA, respectively. Mitchell claims that Momence terminated her in retaliation for complaining to Momence's management about the failures to provide adequate care. Absher alleges constructive discharge for the same reason.

As Absher and Mitchell's suit proceeded, Healthcap brought this action seeking a declaration that it had no duty to defend or indemnify Momence in the under-lying suit based on a commercial general liability policy Healthcap issued to Momence in 2004. That policy pro-vides Momence with multiple lines of coverage. Relevant

to this appeal are the commercial general liability coverage ("CGL coverage") and the professional liability coverage ("PL coverage").[1] The CGL coverage has two separate coverage sections, CGL coverage A,[2] which provides coverage for bodily injury and property damage, and CGL coverage B,[3] which addresses personal and advertising

---

[1]  The part of the PL coverage relevant to this appeal provides:

  We will pay those sums that the insured becomes legally obligated to pay as "damages" because of injury to which this insurance applies. . . . The injury must be caused by a "medical incident." . . . The "medical incident" must arise out of the providing or withholding of the following professional services: Medical, surgical, dental, or nursing treatment to a person. . . . We will have the right and duty to defend any "suit" seeking those "damages" . . . .

[2]  CGL coverage A states in relevant part:

  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

The policy further defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

[3]  The pertinent part of CGL coverage B states:

  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

(continued...)

injury liability. In addition, the CGL coverage contains an employment-related practices exclusion[4] applicable to both CGL coverage A and CGL coverage B.

Approximately a year after filing suit, Healthcap moved for summary judgment, arguing that it had no duty to defend or indemnify Momence. In a comprehensive

---

[3] (...continued)
The policy defines "personal and advertising injury" to mean an

injury, including consequential "bodily injury," arising out of one or more of the following offenses:

. . . .

Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

. . . .

Oral or written publication of material that violates a person's right of privacy.

[4] That exclusion provides:

This insurance does not apply to any claim or "suit" by or on behalf of:

A person arising out of any:

Refusal to employ that person;

Termination of that person's employment; or

Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person . . . .

opinion, the magistrate judge[5] held that Healthcap had no duty to defend Momence. The court further held that the issue of indemnification was not ripe for consideration because Momence had yet to incur any liability in the underlying action. It therefore dismissed the action without prejudice with leave for Momence to reinstate the suit after the underlying proceedings became final and liability had been determined. Momence appeals.

## II.

On appeal, Momence asserts that the magistrate judge erred in concluding that Healthcap had no duty to defend it in the underlying litigation. We review the lower court's grant of summary judgment, as well as its construction of the commercial general liability policy, de novo. *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 687 (7th Cir. 2008). Since this is a diversity action, state law applies. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). The parties proceed under the assumption that Illinois law applies; so will we.

Momence first argues that the magistrate judge's opinion "contain[s] an inherent inconsistency requiring reversal." According to Momence, the inconsistency is the lower court's granting of summary judgment on the duty to defend while postponing judgment on the duty to indemnify. If there really were no duty to defend, Momence points out, then the magistrate judge would

---

[5] The parties consented to proceeding before the magistrate judge. *See* 28 U.S.C. § 636(c).

have held that there was no duty to indemnify either, since the duty to defend is broader than the duty to indemnify. *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 819 (7th Cir. 2008) (applying Illinois law). But because the lower court left open the question of indemnification, Momence reads the magistrate judge's action as admitting that a possibility still exists that the policy covers the underlying suit. And because the possibility of coverage triggers the duty to defend, *see, e.g., Gibraltar Cas. Co. v. Sargent & Lundy*, 574 N.E.2d 664, 673 (Ill. App. Ct. 1991), Momence therefore argues that the lower court wrongly held that Healthcap had no duty to defend.

The "inherent inconsistency" Momence believes is present in the magistrate's decision is of no moment to us. Where, as here, the duty to defend is broader than the duty to indemnify, a finding of no duty to defend necessarily precludes a finding of a duty to indemnify. As the Illinois Supreme Court stated in *Crum & Forster v. Resolution Trust Corp.*:

> In cases such as the instant case where no duty to defend exists and the facts alleged do not even fall *potentially* within the insurance coverage, such facts alleged could obviously never *actually* fall within the scope of coverage. Under no scenario could a duty to indemnify arise. Clearly, where there is no duty to defend, there will be no duty to indemnify . . . .

620 N.E.2d 1073, 1081 (Ill. 1993) (internal citations omitted); *see also Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 421 (7th Cir. 2005) ("Since the claim at issue in *Crum &*

*Forster* did not even *potentially* fall within the scope of coverage for purposes of the duty to defend, it logically followed that the claim would not *actually* fall within the scope of coverage for purposes of the duty to indemnify.").

In this case, just as in *Crum & Forster*, the duty to defend subsumes the duty to indemnify.[6] Holding that an insurer has no duty to indemnify therefore follows inexorably from holding that an insurer has no duty to defend. Accordingly, if the magistrate judge properly ruled that Healthcap did not have a duty to defend, Healthcap was likewise entitled to summary judgment on the issue of indemnification. We need not consider the issue any further, however, because Healthcap has not cross-appealed. *See Greenlaw v. United States*, 128 S. Ct. 2559, 2564 (2008) ("[I]t takes a cross-appeal to justify a remedy in favor of an appellee.").

---

[6] The case cited by the magistrate judge to support holding off on deciding the duty to indemnify, *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523 (7th Cir. 2005), is not applicable here because it is one of the rare cases where the duty to defend and the duty to indemnify are independent of each other. The umbrella insurance policy at issue in *Premcor* did not obligate the umbrella insurer to defend the insured because the primary insurer's policy provided unlimited defense costs. *Id*. at 529. However, the umbrella insurer was still on the hook to indemnify the insured for any liability past the primary insurer's insurance limits. *See id*. at 525. Thus, the court in *Premcor* could only rule on the duty to indemnify after liability in the underlying suit had definitively been decided. *Id*. at 530.

That brings us back to the duty to defend, the sole issue on appeal. Illinois courts determine an insurer's duty to defend by comparing the allegations in the underlying complaint to the relevant provisions of the insurance policy. *Outboard Marine*, 607 N.E.2d at 1212. "An insurer is obligated to defend its insured if the underlying complaint contains allegations that potentially fall within the scope of coverage*." Lyerla*, 536 F.3d at 688 (citing *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005)). In other words, if *any* portion of the suit potentially falls within the scope of the coverage, the insurer is obligated to defend. *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 315 (Ill. 2006) (noting that insurer has duty to defend "even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy"). An insurer may refuse to defend only if "it is clear from the face of the underlying complaint that the allegations set forth in the complaint fail to state facts that bring the case within, or potentially within, the coverage of the policy." *Id*.

Momence argues that the allegations contained in counts one and two of the underlying complaint—the FCA claims and their IWRPA counterparts—potentially fall within the scope of the PL coverage and the CGL coverage. As quoted above, the PL coverage obligates Healthcap to defend any suit seeking damages "because of" an "injury" that is "caused by a 'medical incident'" arising out of the providing or withholding of various professional services, including medical or nursing treatment. Momence points to the allegations of physical harm to the residents

incorporated in counts one and two as the "injury." That physical harm to the residents arose out of a medical incident, Momence asserts, because (according to the underlying complaint) it resulted from the provision of shoddy medical and nursing treatment. Momence therefore concludes that the underlying complaint seeks damages "because of" the physical harm to the residents. As Momence puts it, "*[b]ut for* the inadequate care and resulting bodily injury, there would have been no lost services and no false claim[s]."

Momence uses a similar chain of logic to place counts one and two potentially under the umbrella of CGL coverage A, which covers bodily injury and property damage. CGL coverage A obligates Healthcap to pay those sums Momence becomes "legally obligated to pay as damages *because of* 'bodily injury'" and to defend Momence "against any 'suit' seeking those damages." (emphasis added). As with its PL coverage argument, Momence claims that the injury to the residents is the essential foundation of counts one and two of the underlying complaint. Without such injury, Momence contends, the FCA claims and the companion state-law IWRPA claims would not have been brought. Momence asserts that any damages that may result from counts one and two are therefore "because of" the "bodily injury" suffered by Momence residents, thus triggering Healthcap's duty to defend.

Rather than triggering the duty, that line of argument effectively bypasses it. The injuries to the residents as alleged by the plaintiffs relate back to Momence's cost

reports to the government where it certified that it pro-
vided quality services and care. Plaintiffs claim Momence
knew that was false. The statutory damages they seek
result from those allegedly false filings, and *not* from
any alleged bodily injury to the residents. Although the
allegations in the underlying complaint detailing the
injuries suffered by Momence residents put a human
touch on the otherwise administrative act of false
billing, they need not be proven by the plaintiffs to
prevail. Under the FCA and the IWRPA, the plaintiffs
do not have to show that any damages resulted from the
shoddy care. *See Horizon W. Inc. v. St. Paul Fire & Marine
Ins. Co.*, 214 F. Supp. 2d 1074, 1077-79 (E.D. Cal. 2002)
(citing 31 U.S.C. § 3729(a)) ("Liability under the FCA is
based solely upon the creation or presentation of false
claims to the government, not upon the underlying con-
duct used to establish the falsity of such a claim."), *aff'd*,
45 Fed. Appx. 752 (9th Cir. 2002). Instead, all the plain-
tiffs need to show is that Momence billed the govern-
ment for services and a level of care that it knew it was
not providing.[7] *See United States ex rel. Fowler v. Caremark*

---

[7] Momence contends that the underlying complaint is really not
a qui tam action because the FCA and IWRPA claims in the
underlying suit are without merit. Specifically, Momence
argues that the underlying complaint fails to set forth the
specific false claims that were submitted. We take no position
on the merits of the underlying suit's FCA and IWRPA claims.
We merely note that even if those claims were meritless, that
would not affect the analysis of the duty to defend. *See, e.g.*,
(continued...)

*RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) (providing elements of FCA claim); *see also Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 557 (Ill. 2005) (noting the similarity between the FCA and the IWRPA and finding case law on the FCA "instructive" regarding the interpretation of the IWRPA).

Other courts have recognized this distinction between the proof required for the FCA claim and the conduct underlying the false claims. They uniformly hold that an insurer is not obligated to defend a qui tam suit merely because the insurer would have to defend the insured against a suit for damages resulting from the insured's conduct underlying the qui tam action.[8] The case upon

---

[7] (...continued)
*Valley Forge Ins. Co.*, 860 N.E.2d at 315 (noting that groundless, false, or fraudulent allegations in the underlying suit do not affect the duty to defend).

[8] *See, e.g.*, *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 921-22 (10th Cir. 2008) (noting in a similar FCA case that "[t]he government's injury was not caused by [the nursing home's] failure to provide professional services, but instead resulted from [the nursing home's] submission of false and fraudulent claims for reimbursement. . . . [T]he problem was not the actual level of services provided . . . but rather that [the nursing home] billed for services it did not provide—namely, enhanced services."); *Horizon W. Inc. v. St. Paul Fire & Marine Ins. Co.*, 45 Fed. Appx. 752, 754 (9th Cir. 2002) (unpublished) (affirming the district court's holding that insurer had no duty to defend insured in FCA suit under professional liability
(continued...)

which Momence principally relies, *Watts Industries, Inc. v. Zurich American Insurance Co.*, 18 Cal. Rptr. 3d 61 (Cal. Ct. App. 2004), does not hold to the contrary. Although the underlying suit in *Watts* began as a qui tam action on behalf of southern California municipalities, the municipalities themselves soon intervened. *Id*. at 64. They asserted claims for damages on their own behalf against water systems manufacturers who allegedly sold the municipalities below-grade parts. In deciding that the manufacturers' insurer had a duty to defend the suit under the "property damage" portion of the CGL policy, the court focused exclusively on the damages the *municipalities* sought: the cost of replacing the substandard parts and the costs of future water quality monitoring. *Id*. at 68. No mention was made of the qui tam claims; they did not enter into the court's analysis.

Despite the lack of supporting precedent and a long line of cases holding to the contrary, Momence nevertheless persists in pressing its position that the FCA and IWRPA

---

[8] (...continued)
policy); *Jenkins v. St. Paul Fire & Marine Ins. Co.*, 8 Fed. Appx. 573, 574 (8th Cir. 2001) (unpublished) (same); *M/G Transp. Servs., Inc. v. Water Quality Ins. Syndicate*, 234 F.3d 974, 978 (6th Cir. 2000) (holding, in suit to determine insurer's duty to defend FCA suit seeking recovery of government funds paid after the insured allegedly submitted false records of Clean Water Act compliance, that insured's arguments in favor of a duty to defend were "thinly disguised attempts to bootstrap liability for FCA violations into the coverage provided by the environmental pollution policies").

claims are at least potentially covered. Momence points out that the factual allegations of the underlying complaint control, not the legal theory alleged. The underlying complaint contains a plethora of factual allegations detailing the residents' personal injuries. Based on those allegations, Momence asserts that the suit must be covered by Healthcap's policy.

Momence is correct that the factual allegations in the complaint, and not the legal labels a plaintiff uses, control. *See, e.g.*, *Lexmark Int'l, Inc. v. Transp. Ins. Co.*, 761 N.E.2d 1214, 1221 (Ill. App. Ct. 2001). But factual allegations are only important insofar as they point to a theory of recovery. *See, e.g.*, *USF&G v. Wilkin Insulation Co.*, 578 N.E.2d 926, 932 (Ill. 1991) ("[A]n insurer has a duty to defend its insured if *any* **theory** of recovery alleges potential coverage." (second emphasis added)); *Ill. Emcasco Ins. Co. v. Nw. Nat'l Cas.*, 785 N.E.2d 905, 908 (Ill. App. Ct. 2003) (noting that duty to defend arises "if the insurance covers the liability on any set of facts consistent with the allegations needed to support recovery on *any theory raised in the complaint*") (emphases added). And it is impossible to construe the underlying complaint as raising any theory of recovery based on bodily injury. Neither of the plaintiffs in the underlying suit seeks damages for personal injury caused by substandard medical care. Nor could they—Absher and Mitchell were employees of Momence, not residents, and they lack standing to sue on

the residents' behalf.[9] *See BASF AG*, 522 F.3d at 820-21; *Kittay v. Allstate Ins. Co.*, 397 N.E.2d 200, 203 (Ill. App. Ct. 1979).

Momence makes two other arguments in favor of coverage, both of which lack merit. Momence maintains that Absher's and Mitchell's claims of emotional distress in counts three and four (the retaliation claims) are properly classified as claims for "bodily injury" under CGL coverage A, which defines "bodily injury" as "bodily injury, sickness or disease sustained by a person." Momence attempts to sidestep Illinois case law clearly

---

[9] Momence suggests that Absher "*may* have standing" to bring a claim against Momence on behalf of her mother, who was a resident of Momence and died there a few weeks before Absher left Momence's employ. (Emphasis added.) But the underlying complaint is absolutely devoid of any factual allegations suggesting such a claim. *See E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443-44 (7th Cir. 2008) ("Federal pleading rules require the plaintiff to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). The underlying complaint does not mention Absher's mother. Nor does it contain any allegation suggesting that Momence was at fault for her death. Indeed, it does not even list the estate of Absher's mother as a party to the suit. While an insurer certainly has a duty to defend its insured against any complaint that leaves open the possibility of coverage, *Ill. Emcasco Ins. Co.*, 785 N.E.2d at 907, that duty is premised on the facts the parties to the underlying complaint actually alleged in their complaint, not on those facts that a *nonparty* to the suit *could have alleged* had it decided to sue as well.

holding to the contrary[10] by contending that the policy itself classifies such claims as "bodily injury." We need not describe in detail the tortured interpretation of the policy Momence presents to support that assertion. For even if Momence is correct that the policy counts emotional distress as "bodily injury"—and it does not—the employment-related practices exclusion forecloses coverage of any claims for damages arising from counts three and four of the underlying complaint.

Specifically, that exclusion provides that the CGL coverage does not extend to "any claim" by a "person arising out of any . . . *[t]ermination of that person's employment*[ ] or *[e]mployment-related practices*, policies, acts or omissions, such as coercion, . . . defamation, *harassment*, humiliation or *discrimination* directed at that person." (Emphases added.) In counts three and four, Mitchell and Absher allege that Momence retaliated against them because they had attempted to call to the attention of Momence's management the failure to provide the requisite level of care. They also allege that the retaliation culminated in Momence terminating Mitchell's employment and constructively discharging Absher. Those allegations fall squarely within the employment-related practices exclusion.

---

[10] *See SCR Med. Transp. Servs., Inc. v. Browne,* 781 N.E.2d 564, 571 (Ill. App. Ct. 2002) (collecting cases restricting term "bodily injury" in insurance policy to "actual physical injury," as opposed to broadening it to include mental anguish and mental distress).

Momence's arguments against the application of the exclusion are unconvincing. Momence contends that Absher's allegations of constructive discharge do not amount to an "employment practice" because she left Momence on her own. But a constructive discharge is the legal equivalent of a formal termination, *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004), and a termination is unambiguously within the employment exclusion. Moreover, constructive discharge is an allegation concerning an employer's "[e]mployment-related practices, policies, acts or omissions" and thus falls within the ambit of the employment-related practices exclusion.

Momence also argues that the following allegation in count three falls outside of the employment-related practices exclusion: "Momence Meadows['s] management faxed Plaintiff Absher's letter of resignation to potential employers in an effort to prevent her from finding other employment."[11] The exclusion does not cover that allegation, Momence asserts, because Absher was no longer a Momence employee when the alleged faxing occurred. The exclusion, however, is not limited to alleged wrongs occurring during the employment relationship. Rather, the exclusion bars any claim "arising out of" any "[e]mployment-related . . . acts," including discrimination. *Cf. Am. Alliance Ins. Co. v. 1212 Rest. Group, L.L.C.*, 794 N.E.2d 892, 900 (Ill. App. Ct. 2003) ("Posttermination acts of defamation or other employment-related practices

---

[11] Absher stated in the letter that she was "taking an emergency mental health leave of absence."

can reasonably arise directly and proximately from the termination.").

The retaliation alleged here is unequivocally "employment-related." It was Momence's alleged attempt to "settle the score" with Absher for actions she took during their employment relationship. Indeed, the only reason Momence was in possession of Absher's resignation letter was by virtue of its employment relationship with her. The exclusion therefore applies to that allegation of retaliation.

That brings us to Momence's final argument in favor of a duty to defend. Momence claims that the allegations of retaliation based on its use of Absher's resignation letter, its termination of Mitchell for speaking out against the deficiencies in resident care, and its wrongful reporting of both Absher and Mitchell to the Illinois Department of Professional Regulation[12] are potentially covered under the PL coverage. The PL coverage contains no exclusion for employment-related practices, so the only issue is whether those allegations potentially fall within the scope of the PL coverage. To show that they potentially are within the scope of that coverage, Momence turns to the PL coverage's definition of "injury." That definition includes "personal injury." Because "personal injury" is not specifically defined in the PL coverage, Momence imports the definition of "personal and ad-

---

[12] The underlying complaint alleges that Momence "filed fabricated charges against both Plaintiffs with the Illinois Department of Professional Regulation."

vertising injury" from CGL coverage B. The definition of "personal and advertising injury" found there includes publishing oral or written statements that either disparage a person's services or violate a person's right to privacy. According to Momence, the above allegations concern either disparagement (in the case of Mitchell's termination and the wrongful reporting of Mitchell and Absher to the Illinois nursing regulators) or invasion of privacy (in the case of Absher's resignation letter, which contained details about her mother's death). Therefore, Momence concludes, those allegations fall within the scope of the PL coverage.

A glaring problem with this argument is that injury is defined in the PL coverage to include "personal injury," *not* "personal *and advertising* injury." But even if we except Momence's grafting of "advertising injury" into the PL coverage's definition of "injury," Momence's argument is still a loser—it runs aground on the plain text of the PL coverage. The PL coverage does not cover just *any* personal injury. It states that an injury, personal or otherwise, "must be caused by a 'medical incident.'" The "medical incident," in turn, "must arise out of the providing or withholding of the following professional services: [m]edical, surgical, dental, or nursing treatment to a person." Nowhere has Momence explained how Mitchell's and Absher's alleged injuries arise from the "providing or withholding" of "professional services." So even if it is true that the retaliation Absher and Mitchell experienced was an "injury" as the PL coverage defines that term, it was not an injury caused by a "medical incident"—and thus not covered under the PL coverage.

## III.

The wrongdoings for which the plaintiffs in the underlying suit attempt to hold Momence liable are the filing of false claims and the unlawful employment actions taken against Absher and Mitchell, not the injuries suffered by the Momence residents. Because none of the policy provisions cover such claims, Healthcap does not have a duty to defend Momence in the underlying suit. We AFFIRM.