923 A.2d 264 (2007)
393 N.J. Super. 255
Kimberly A. JOLLEY and Robin Jolley, Sr., as subrogee of Barbara Gorna and Barbara Gorna, individually, Plaintiffs-Respondents,
v.
John J. MARQUESS, Esquire, Law Offices of John J. Marquess, Law Offices of Marquess, Morrison & Trimble, P.A. and American Independent Insurance Company, Defendants-Respondents, and
John J. Marquess, Esquire, Defendant/Third Party Plaintiff-Respondent,
v.
Zurich Specialties London Limited, Third Party Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Telephonically Argued March 7, 2007.
Decided May 25, 2007.
*266 Steven J. Polansky, Cherry Hill, argued the cause for third party defendant-appellant Zurich Specialties London Limited (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Mr. Polansky, on the brief).
Patrick J. Madden, Haddonfield, argued the cause for defendant-third party plaintiff-respondent John J. Marquess, Esquire (Madden, Madden & Del Duca, attorneys; Mr. Madden, on the brief).
Before Judges WINKELSTEIN, FUENTES and BAXTER.
*265 The opinion of the court was delivered by
BAXTER, J.S.C. (temporarily assigned).
In this appeal, we decide whether a policy of insurance providing coverage for legal malpractice requires the insurer to provide indemnification to a former partner of a law firm for acts of malpractice allegedly committed subsequent to the dissolution of that firm. Under the facts presented, we conclude that the former partner was acting "solely in a professional capacity on behalf of such firm," as required by the policy of insurance and was entitled to a defense and indemnification. Accordingly, we affirm the trial court's *267 grant of summary judgment in favor of defendant John J. Marquess, Esquire.

I.
Marquess is a former partner and former employee of the Turnersville law firm of defendant Marquess, Morrison and Trimble, P.A. ("the firm" or "MMT"). The firm was insured under a policy of insurance issued by third-party defendant Zurich Specialties London Limited (Zurich), which provided professional liability coverage for the firm's associates and partners, and for former partners and associates, but only if specified conditions were satisfied.
While Marquess was still a partner, the firm was retained by American Independent Insurance Company (AIIC) in order to defend AIIC's insured Barbara Gorna in an automobile negligence action, Kimberly A. Jolley and Robin Jolley v. Barbara Gorna, Docket No. MER-L-1587-97 (the Jolley matter). During the pretrial stage of the Jolley matter, Marquess was a partner of the firm.
The automobile accident constituting the Jolley matter occurred on December 5, 1996, when a vehicle driven by Gorna failed to yield at a stop sign and collided with a vehicle driven by Molly Schaffer, which in turn collided with the postal truck being operated by Jolley, causing Jolley to sustain severe injuries. Jolley filed a complaint on April 22, 1997, against Gorna, Schaffer, and Jerzy Mankiewicz, the owner of the vehicle being operated by Gorna. Mankiewicz's insurer was AIIC, and AIIC assigned the defense of the Gorna/Mankiewicz matter to MMT. AIIC had been a long-standing client of the firm, but Marquess and Trimble both considered AIIC to be Morrison's client in particular. The answer to plaintiff's complaint was filed on April 20, 1998, and designated Morrison as trial counsel, in accordance with the requirements of Rule 4:5-1(c). A few months later, when Gorna was served with interrogatories, Morrison asked Marquess to answer the interrogatories and handle all of the pretrial discovery and motions, which he did.
Counsel for Jolley sent numerous Rova Farms[1] letters to both the firm and to AIIC between March 4, 1998 and November 18, 1998. All letters sent to the firm were addressed to Morrison. Receiving no response to any of these letters, plaintiff's counsel finally sent MMT a letter on December 16, 1998, notifying MMT that his client would no longer accept Gorna's policy limits in settlement of the matter. The first time anyone at MMT responded to the Rova Farms letters was on December 22, 1998, when Marquess notified Jolley's counsel that AIIC had authorized a settlement within the policy limits. On January 4, 1999, plaintiff's counsel responded that it was too late, and that his client intended to pursue all of her claims for damages without any limitations and would be looking to the carrier for payment of any damages in excess of the policy limits.
On November 2, 1999, while Marquess was handling the Gorna file, disputes between the three partners led Marquess and the two remaining partners, Morrison and Trimble, to enter into a stock purchase agreement whereby Morrison and *268 Trimble agreed to acquire all of Marquess's interest in the firm, effective April 30, 2000, whereupon the firm was to be dissolved. Marquess left the firm as planned on April 30, and his former partners continued to practice together, under a new firm name of Morrison and Trimble. The dissolution agreement specified that Marquess would remain with the firm as a "senior trial attorney" after November 3, 1999, until his final termination date of April 30, 2000, but would no longer be a partner of the firm after November 3. In his capacity as a senior trial attorney, Marquess continued to represent Gorna until he left the firm on April 30. In early February 2000, three months before Marquess left the firm, MMT received a notice from the Mercer County Case Management Office that the Jolley matter was scheduled for trial on May 15, 2000.
After leaving MMT, Marquess began practicing as a sole practitioner on May 1, 2000, under the firm name Law Offices of John J. Marquess, P.A. The stock purchase agreement permitted Marquess to take with him 75 to 100 clients of the former firm, subject to those clients' consent, and the newly-formed firm of Morrison and Trimble retained the remaining clients. Neither AIIC nor Gorna was included in the list of clients that Marquess took with him when he established his new firm on May 1, 2000.
On May 8 or May 9, 2000, less than one week before trial of the Jolley matter was scheduled to begin, Morrison contacted Marquess requesting him to try the case. Marquess agreed to do so, but only if Morrison agreed to let him bill AIIC directly because, according to Marquess, his former firm already owed him $29,000, and he was not willing to run the risk of not being paid for his work trying the Jolley matter.
The May 15, 2000 trial date was adjourned, and ultimately jury selection began on August 8, 2000. At the conclusion of testimony on August 9, the jury rendered a verdict finding Gorna 100% responsible for the happening of the accident. That same day, Marquess entered into an agreement with counsel for Jolley, agreeing that Gorna would pay to Jolley stipulated damages in the amount of $750,000, to which prejudgment interest would be added. At the time the agreement was made, Gorna was no longer in the courthouse and had never been asked to consent to the stipulation of damages. Gorna's AIIC policy limits were $15,000/$30,000. An order was signed on September 5, 2000, entering judgment in favor of Jolley, and against Gorna, in the amount of $750,000, plus $128,475 in interest.
An August 9, 2000 letter from Marquess to Gorna assured her that Jolley's counsel had "agreed not to pursue any [portion] of the $750,000 figure against [her]" and opined "this is a very good outcome for you, since you will not have to pay that $750,000." Marquess's representation to Gorna that she would not be personally responsible for payment of any portion of the $750,000 judgment was not reflected in the Order for Judgment executed by the court on September 5, 2000.
As a result of learning that Marquess had stipulated to damages without her consent and had obligated her to pay a total of $878,475 to Jolley from her own funds, less the $15,000 policy limit, on October 26, 2000, Gorna executed an assignment to Jolley of her right to pursue a claim against Marquess. The assignment enabled Jolley to institute litigation against AIIC and Marquess. In return for receiving that assignment of rights, Jolley agreed to withhold action in executing the judgment against Gorna. Upon being advised that a cause of action for legal malpractice *269 could not be assigned, Jolley and Gorna jointly filed suit against Marquess and AIIC with the complaint designating the plaintiffs as "Kimberly Jolley and Robin Jolley, Sr.,[2] as subrogees of Barbara Gorna, and Barbara Gorna individually."
Suit was instituted by Gorna and Jolley on October 31, 2001. The four-count complaint alleged a breach of the contractual duty of good faith and fair dealing by AIIC toward its insured, Gorna (count one); legal malpractice and breach of the duty of care owed to Gorna by MMT and/or Marquess in failing to adhere to reasonable standards of a qualified and competent attorney (count two); breach by Marquess and/or MMT of express or implied covenants that the attorneys representing Gorna would be knowledgeable and experienced (count three); and the making of false, deceitful and fraudulent misrepresentations of fact and/or law in the representation of Gorna by Marquess and/or MMT (count four).
Zurich was the malpractice carrier for Marquess, Morrison and Trimble before Marquess left the firm on May 1, 2000, and Zurich continued to provide professional liability insurance to Morrison and Trimble under a new policy after Marquess left. After Marquess was served with the malpractice complaint, he filed a third party complaint against Zurich asserting that Zurich was obligated to provide a defense and indemnification concerning the claims being asserted against him by Jolley and Gorna. In its answer, Zurich specifically denied having any duty to indemnify Marquess or provide a defense to the malpractice claims being asserted against him. Zurich denied coverage to Marquess, asserting that he was not a member of the firm of Morrison and Trimble, or a named insured on Morrison and Trimble's policy of insurance at the time any alleged malpractice by Marquess may have been committed. In particular, Zurich asserted that the $750,000 stipulation of damages by Marquess occurred after he left the firm.[3]
In January 2006, both Zurich and Marquess filed cross-motions for summary judgment. During the motion hearing, each side described the circumstances surrounding the transfer of the Gorna file to Marquess in May 2000. The circumstances were to some degree in dispute, with Marquess asserting that Morrison asked him to try the Gorna matter, and Zurich insisting that AIIC made that request.[4] Both sides agreed, however, that no substitution of attorney was ever filed. At the time jury selection began on August 8, 2000, the firm of Morrison, Marquess and Trimble remained counsel of record for Gorna. Zurich argued before the Law Division, and now argues before us, that a substitution of attorney was forwarded to Marquess by his former partners, but that Marquess never filed it. Marquess, in turn, contends that his former partners have never produced a substitution, either in draft or otherwise, despite a demand for same having been made at depositions. Marquess further maintains that Zurich has never produced a copy of any substitution, or a letter forwarding same to Marquess. Additionally, both Marquess and Zurich agree that Marquess billed AIIC directly for his work on the Gorna file after May 1, 2000. Both sides also agree *270 that when Marquess left MMT, he did not forward a Counsel Selection Form to AIIC. Indeed, he testified at his deposition that if he had made any effort to contact AIIC directly or do any work for AIIC, "John Trimble would have had [him] arrested."
The motion judge was also presented with Marquess's deposition testimony that after he left his former firm, from time to time Morrison would call him and ask him to handle "problem" cases for them, cases "they were afraid of, the ones they didn't like, they would ask [him] to handle, and the Gorna file was one such file." Marquess's testimony that Morrison asked him to try the case as a favor to him is corroborated by Morrison. At his deposition, Morrison was asked whether "[a]s of the point that John Marquess left the firm, April 30, 2000, as of that point, would you personally have been in a position to act as defense counsel at the impending trial of Jolley v. Gorna?". Morrison gave a one-word answer, "no."
Marquess pointed to other facts in support of his claim that he tried the Gorna matter solely on behalf of his former firm. For example, at the end of each day of trial, Marquess sent a letter to the claims adjuster at AIIC summarizing the day's proceedings, and sent Morrison a blind carbon copy of each. Additionally, Morrison remained involved in the handling of the Gorna file. As late as June 2000, Morrison reviewed the plaintiff's economic/vocational loss report and sent it to a professor at the University of South Carolina to determine whether there was a basis for attacking the damages conclusions reached by Jolley's economic loss expert.
From these facts, Marquess argued in the Law Division that all of the work he did on the Gorna file after he left the firm in May 2000 was at the request of Morrison and Trimble, and that he was hired by them to try the case solely on their behalf. Stated differently, Marquess argued that after he left the firm, the file remained a Morrison and Trimble file, and it remained so at the time any act of malpractice was committed. He argued that accordingly he was entitled to a defense and indemnification under the Zurich policy of insurance issued to Morrison and Trimble after he left the firm on April 30, 2000.
Zurich, in contrast, argued that because AIIC asked Marquess to take over the file and AIIC paid him directly for all the work he did on the file after he left his former firm, Morrison and Trimble's malpractice insurance policy should not come into play because Morrison and Trimble had surrendered all responsibility for the file when they physically transferred it to Marquess during the first week of May.
On March 17, 2006, Judge Jacobson heard oral argument and granted summary judgment in favor of Marquess, holding that Zurich was required to both defend and indemnify him for all claims asserted against him by Jolley. The court certified the order as final, pursuant to Rule 4:42-2, staying the legal malpractice claim until Zurich's appeal of the March 17, 2006 order is resolved.

II.
The policy Zurich issued to Morrison and Trimble on June 1, 2000 defines an "insured" as:
1. The Insured: The unqualified word "insured", whenever used in this policy means:
(a) the Named Insured firm or predecessor firm set forth in the Declarations;
(b) any partner of the Named Insured firm or predecessor firm, including any incorporated partners and their shareholders, but solely while acting in [a] *271 professional capacity on behalf of such firm or firms;
(c) any person who is not defined as Named Insured, but was, is now, or hereinafter becomes an employed lawyer or another employee of the firm or predecessor firms named in the Declarations solely while acting in a professional capacity on behalf of such firm or firms;

(d) any former partner, officer, director or stockholder employee of the firm or predecessor firms named in the Declarations while acting solely in a professional capacity on behalf of such firms;

(e) any partner, officer, director or stockholder employee of the firm or predecessor firms named in the Declarations who have retired from the practice of law, but only for those professional services rendered prior to the date of retirement from the Insured firm;
(f) as respects the liability of each Insured as is otherwise covered herein, the heirs, executors, administrators, assigns and legal representatives of each Insured in the event of death, incapacity or bankruptcy.
(g) Lawyers acting as "of Counsel", but only while acting in a professional capacity on behalf of the Named Insured.
(emphasis added)
To determine whether summary judgment was properly granted to Marquess, this court must consider "`whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995)). In ruling in favor of Marquess, Judge Jacobson determined that although some facts were in dispute, none of the disputed facts were material, and that Marquess was entitled to judgment as a matter of law. When reviewing the trial court's grant of summary judgment, this court uses the same standards as that court did and decides first whether there was a genuine issue of material fact, and if not, it then decides whether the trial court's ruling on the law was correct. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).
We agree with the judge's finding that what mattered was that Marquess received the Gorna file for trial, not who sent it to him. Nor do we think the billing arrangement, in which Marquess billed AIIC directly, is dispositive. We also agree with the judge's conclusion that the dispute concerning why the substitution of attorney was never filed was immaterial, and the only material fact is that none was filed.
This appeal requires us to construe the policy language defining who is an insured. Specifically, we must determine whether under subsection (c), Marquess qualifies as a "person who . . . was . . . an employed lawyer . . . of the firm . . . solely while acting in a professional capacity on behalf of such firm," or whether pursuant to subsection (d), he is a "former partner . . . while acting solely in a professional capacity on behalf of such firm." Our own research, and that of the parties, yields no reported decisions in this state construing this policy language.
It is clear, however, that subsection (c) pertains to persons who are not partners, officers, directors or stockholders of the firm, but who are instead "employed lawyers," or associates. Subsection (c) could therefore potentially provide coverage to Marquess for any acts of malpractice committed between November 3, 1999, *272 when he ceased to be a partner and functioned as a "senior trial attorney," and April 30, 2000, when he left the firm. Moreover, if, as Marquess claims, his work on the Jolley matter after May 1, 2000 was at the behest of Morrison, and the file remained a Morrison and Trimble file after that date, he would be entitled to coverage provided that he was deemed to be "acting solely in a professional capacity on behalf of such firm." Subsection (d) in contrast, deals with former partners, officers, directors and stockholders, and specifies that such persons will constitute an insured only "while acting solely in a professional capacity on behalf of such firms."
Unquestionably, the language in subsection (c) and (d) is neither clear, nor straightforward. Interpreting it is complicated by the vague and uncertain language Zurich has chosen to utilize. As we approach the task of construing the policy language, we recognize that "an insurance policy should be interpreted according to its plain and ordinary meaning." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992). "But because insurance policies are adhesion contracts, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." Ibid.
Thus, when the language of the policy is clear, and in the absence of any ambiguity, courts "`should not write for the insured a better policy of insurance than the one purchased.'" Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. 530, 537, 582 A.2d 1257 (1990) (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989)). However, because the insurance company is an "expert in the field," when the meaning of a phrase in a policy is ambiguous, the Court has held that the "ambiguit[y] . . . [is] to be interpreted in favor of the insured . . . ." Gibson v. Callaghan, 158 N.J. 662, 670, 730 A.2d 1278 (1999).
When the court is called upon to interpret an ambiguous phrase in an insurance contract, it should "consider whether more precise language by the insurer, had such language been included in the policy, `would have put the matter beyond reasonable question.'" Ibid. (quoting Doto v. Russo, 140 N.J. 544, 557, 659 A.2d 1371 (1995)). Additionally, insurance "policies must be construed to comport with the reasonable expectations of the insured." Id. at 671, 730 A.2d 1278. Thus, if the ambiguous clause is one concerning an extension of coverage to the insured, it should be "viewed broadly and liberally." Ibid. Where the "`language of an insurance policy supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied.'" Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273, 765 A.2d 195 (2001) (quoting Lundy v. Aetna Cas. & Sur. Co., 92 N.J. 550, 559, 458 A.2d 106 (1983)).
Although the language used in subsections (c) and (d) is difficult to interpret, we discern from that language an intention to limit coverage to those instances where a former associate or former partner is representing a party who remains a client of the insured firm, as opposed to a successor firm. Zurich, in contrast, urges us to interpret its policy language to mean that coverage is afforded for only those professional services that are rendered by former associates or partners prior to the date the former associate or partner leaves the insured firm.
In reply to that argument, Marquess observes that Zurich utilized such an approach in subsection (e), which applies to retired partners. There, the policy specifies that "any partner, officer, director or *273 stockholder employee" of the firm who has "retired from the practice of law" does constitute an insured, "but only for those professional services rendered prior to the date of retirement from the insured firm." Thus, Marquess argues had Zurich wanted to limit its exposure to only those professional services rendered while a former associate or partner was employed by the firm it could easily have chosen to utilize the same language for former partners and associates as it chose to use in subsection (e) for former partners and associates who have entirely retired from the practice of law. Zurich chose not to do so, and accordingly, we consider whether more precise language by Zurich, had such language been included in the policy, would have put the matter beyond reasonable question. Gibson, supra, 158 N.J. at 670, 730 A.2d 1278.
Applying the principles outlined in Gibson, we conclude that Zurich could have used the same language for former partners such as Marquess that it chose to use for former partners who are completely retired from the practice of law. It did not do so and should not be entitled to interpret the policy language in subsections (c) and (d) as though that language is identical to the language in subsection (e). We thus reject Zurich's argument that because any malpractice by Marquess occurred after he left the firm, he cannot be deemed to satisfy the policy language "acting solely in a professional capacity on behalf of the firm" or "solely while acting in a professional capacity on behalf of such firm."
Zurich could have utilized policy language that would have eliminated all ambiguity and which "would have put the matter beyond all reasonable question." Ibid. Zurich did not do so; therefore, we construe the ambiguity in favor of coverage, which is the approach long favored in this state. Ibid.
As the trial judge properly found, there was no genuine issue of material fact refuting Marquess's assertion that when he tried the Jolley matter, he did so solely on behalf of his former firm. Numerous facts in the record support that conclusion: Morrison himself was unprepared to try the case; he forwarded the file to Marquess and asked him to try it; the stock purchase and employment agreement did not list AIIC or Gorna as clients Marquess was permitted to take with him when he left; Gorna was never asked to consent to any change in the designation of the law firm responsible for representing her; Morrison assisted in the evaluation of Jolley's expert report on economic loss after the file was transferred to Marquess; no substitution of attorney was ever filed; and Marquess kept Morrison advised of all developments in the case starting in early June and continuing through the end of the trial. That Marquess was paid a fee for his work does not change the result, for, as the trial judge properly observed, we would not expect a lawyer continuing to handle a file on behalf of his former firm to do so for free. Under all of these circumstances, we conclude that when Marquess tried the case, he was "acting solely in a professional capacity on behalf of such firm."
Having determined that Marquess was "acting solely in a professional capacity on behalf of [his former] firm," and was thus an insured, as that term was defined by the policy Zurich issued, we turn to a review of the allegations of the malpractice complaint to determine whether coverage should be afforded. In determining whether Marquess is entitled to a defense and indemnification, we compare the allegations of the malpractice complaint to the language contained in the Zurich policy *274 because the duty to defend and indemnify "`comes into being when the complaint states a claim constituting a risk insured against.'" Voorhees, supra, 128 N.J. at 173, 607 A.2d 1255 (quoting Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), aff'd o.b., 15 N.J. 573, 105 A.2d 677 (1954)). When the complaint and the language of the policy correspond, the insurer clearly must defend the suit. SL Indus. v. Am. Motorists Ins. Co., 128 N.J. 188, 197, 607 A.2d 1266 (1992).
However, the duty to defend is not necessarily limited to what is set forth in the complaint. The Court in SL Industries, held that "facts outside the complaint may [also] trigger a duty to defend." Id. at 198, 607 A.2d 1266. In reaching this broad holding, the Court reasoned that "[t]o allow the insurance company `to construct a formal fortress of the . . . pleadings and to retreat behind its walls, thereby successfully ignoring true but unpleaded facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense,' would not be fair." Id. at 199, 607 A.2d 1266 (quoting Associated Indem. v. Ins. Co. of N. Am., 68 Ill.App.3d 807, 25 Ill. Dec. 258, 386 N.E.2d 529, 536 (1979)).
The specificity of the claims in the complaint does not always conclusively determine whether the insurer has a duty to defend; therefore, "[i]f the complaint is ambiguous, doubts should be resolved in favor of the insured and thus in favor of coverage." Voorhees, supra, 128 N.J. at 173-74, 607 A.2d 1255. The Court reasoned that "[t]he duty to defend . . . is determined by whether a covered claim is made, not by how well it is made." Id. at 174, 607 A.2d 1255.
We agree with Judge Jacobson's conclusion that the complaint is worded broadly enough to encompass malpractice potentially committed by Marquess even before he left the firm on May 1, 2000. Zurich also argues before us, as it did before the Law Division, that any acts of malpractice by Marquess occurred after May 1, 2000, when he stipulated to damages in the amount of $750,000. We disagree, and agree with Marquess that the malpractice complaint encompasses the failure by all three partners, including Marquess, to respond appropriately to the Rova Farms letters that were sent between March and November 1998. Zurich points to those portions of the malpractice complaint addressing Marquess's conduct during the August 2000 trial, but ignores other portions of the complaint that make general allegations of negligence or malpractice not limited to any particular time period. Such allegations include paragraphs nine and ten of the second count which provide:
9. At all times material hereto, legal defendants breached their duty of care owed to Barbara Gorna through their professional representation of Barbara Gorna failed to adhere to reasonable standards of a qualified and competent attorney within the community thereby negligently, directly or indirectly, and/or incidentally or consequently causing damage to Barbara Gorna. (emphasis added)
10. Furtherance of the breach of professional responsibility with Barbara Gorna, breach of fiduciary obligations, professional responsibility, intentional misrepresentations and damage to Barbara Gorna.
In the third count, which alleges breach of implied or expressed contractual obligations to provide knowledgeable and experienced attorneys to represent her, Gorna again alleges conduct occurring both before and after Marquess's departure from the firm on May 1, 2000. Paragraphs two and five of count three allege:

*275 2. At all times material hereto, defendants John Marquess, Esquire, Law Offices of John J. Marquess, Law Offices of Marquess, Morrison and Trimble, P.A. expressly and/or implied that they employed skilled knowledgeable, experienced and licensed attorneys to practice law in the State of New Jersey. (emphasis added)
. . . .
5. Defendants breached its [sic] agreement with Barbara Gorna in that defendants, Law offices of John J. Marquess and/or Law Offices of Marquess, Morrison and Trimble, P.A. and defendant's employee John J. Marquess, Esquire, failed to properly protect the interest of Barbara Gorna in the underlying action.
We agree with Marquess that the complaint as a whole asserted claims against the former firm of Marquess, Morrison and Trimble and against Marquess himself while doing business as the Law Offices of John Marquess. The complaint is not limited to any particular point in time, nor is it confined to allegations about Marquess's conduct after he left MMT. Zurich is defending Morrison and Trimble for any and all malpractice they committed in connection with the Jolley matter since its inception. Zurich's acknowledgment that Morrison and Trimble are entitled to coverage compels the conclusion that Marquess would likewise be entitled to a defense and possible indemnification for any acts of malpractice he committed as long as a fair reading of the malpractice complaint triggers coverage. Id. at 173, 607 A.2d 1255.
Our conclusion that the malpractice complaint is worded broadly enough to cover Marquess's conduct both before and after he left the firm is strengthened by the language contained in the assignment of rights given by Gorna to Jolley. Nothing contained there limits the assignment of rights to Marquess's conduct at the trial where he stipulated to damages in the amount of $750,000. Instead, Gorna assigned "any and all rights, claims and causes of action which I may have against. . . John Marquess, and others as a result of their handling of a lawsuit filed by Kimberly Jolley against me. . . ." Thus, Jolley's claims as a subrogee of Gorna encompass the entire time period that Marquess worked on her file and are not limited to the time period in August 2000, when he stipulated to damages.

III.
Alternatively, Zurich argues that regardless of whether Marquess was or was not deemed to be "acting solely on behalf of such firm," an exclusion in the policy for "fraudulent conduct" relieves Zurich of any duty to provide a defense or indemnify Marquess. Zurich's argument, which arises from count four of the complaint, relies on the following exclusion:
THE EXCLUSIONS
1. This policy does not apply:
a) to any judgment or final adjudications based upon or arising out of any dishonest, deliberately fraudulent, criminal, maliciously or deliberately wrongful acts or omissions committed by the Insured. However, notwithstanding the foregoing, the Underwriters will provide a defense for any such claims without any liability on the part of the Underwriters to pay such sums as the Insured shall become legally obligated to pay as damages.
The above exclusion, by its terms, applies only when a final judgment has been entered. The duty to provide a defense to Marquess is acknowledged by the language of the clause which states that "notwithstanding the foregoing, the Underwriters *276 will provide a defense for any such claims. . . ." Indeed, as we have discussed, the Court has held the fact "[t]hat the claims are . . . almost sure to fail is irrelevant to the insurance company's initial duty to defend." Voorhees, supra, 128 N.J. at 174, 607 A.2d 1255.
Here, although count four of the malpractice complaint alleges conduct that may ultimately be ineligible for indemnification under the Zurich policy, that fact does not relieve Zurich initially of its duty to defend Marquess. The duty to defend is broader than the duty to indemnify. Ibid. Indeed, Zurich's own policy language in section 1(a) requires it to provide a defense to fraud claims even if no indemnification will ultimately be afforded. Accordingly, the trial court's decision requiring Zurich to provide a defense on count four, even though it alleged fraudulent conduct, was not error.
Affirmed.
NOTES
[1] See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974) (holding that the insurer, who has "contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage" by "offer[ing] its policy limits [and] try[ing] to settle the matter if there is any possibility of a judgment above the [policy] limits").
[2] Robin Jolley, Sr. was ultimately dismissed from the litigation because he was not legally married to Kimberly Jolley, and therefore could not pursue a per quod claim.
[3] Zurich did not dispute its obligation to provide a defense and possible indemnification to Morrison and Trimble for any acts of malpractice they may have committed, including their failure to respond to Rova Farms letters.
[4] Zurich was not able to provide any documents to support its contention.